ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL GENERAL DE JUSTICIA
TRIBUNAL DE APELACIONES
**PANEL ESPECIAL**

| | | |
|---|---|---|
| **EGR Anesthesia Services, PSC; Edwin G. García Rivera; Presidente de la Junta de Directores** DEMANDANTE(S)-APELANTE(S) <br><br> V. <br><br> **Lilliam Serrano Mercado por sí y en representación de la Sociedad Legal de Gananciales Compuesta con John Doe y Otros** DEMANDADA(S)-APELADA(S) | **KLAN202300179** | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de **PONCE** <br><br> Caso Núm. **PO2019CV01673 (601)** <br><br> Sobre: Incumplimiento de Contrato; Daños y Perjuicios Contractuales; Daños y Perjuicios mediante Interferencia Torticera Contractual, Interdicto Preliminar y Permanente |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Juez Barresi Ramos y el Juez Rivera Colón.[1]

*Barresi Ramos*, juez ponente

### S E N T E N C I A

En San Juan, Puerto Rico, hoy día 19 de mayo de 2025.

Comparece ante este Tribunal de Apelaciones, **EGR Anesthesia Services, PSC** (**EGR**) y el señor **Edwin G. García Rivera** (señor **García Rivera**) mediante *Apelación Civil* incoada el 6 de marzo de 2023. En su escrito, nos solicitan que revisemos la *Sentencia* dictada el 2 de febrero de 2023 por el Tribunal de Primera Instancia (TPI), Sala Superior de Ponce.[2] Mediante dicha *Sentencia*, condenó a **EGR** al pago de los daños sufridos por los señores **Lilliam Serrano Mercado** (señora **Serrano Miranda**), **Elsa H. Vargas Pérez** (señora **Vargas Pérez**), **José A. Morales Ramos** (señor

---

[1] En virtud de la *Orden Administrativa OATA-2025-019* de 10 de febrero de 2025, el Juez Rivera Colón sustituyó a la Jueza Rivera Pérez quien cesó de ejercer funciones en el Tribunal de Apelaciones.

[2] Este dictamen judicial fue notificado y archivado en autos el 2 de febrero de 2023. Apéndice de la *Apelación,* págs. 1- 39.

Número Identificador: SEN2025_____

MORALES RAMOS) y JOEL BURGOS ROBLES (señor BURGOS ROBLES). Además, le impuso la suma de $11,000.00 en concepto de honorarios de abogado.

Exponemos el trasfondo fáctico y procesal que acompañan a la presente controversia.

- I -

El 16 de mayo de 2019, EGR y el señor GARCÍA RIVERA, presidente de la Junta de Directores, interpusieron una *Demanda y Solicitud de Interdicto Preliminar y Permanente* sobre incumplimiento de contrato; daños y perjuicios contractuales; daños y perjuicios mediante interferencia torticera contractual; e interdicto preliminar y permanente.[3] Alegaron que los señores SERRANO MERCADO, VARGAS PÉREZ, MORALES RAMOS y BURGOS ROBLES laboraban para EGR el cual proveía servicios al HOSPITAL METROPOLITANO DR. PILA (HOSPITAL) y estos incumplieron con la cláusula de no competencia en sus *Contratos de Servicios Profesionales*. Señalaron que estos ofrecían los mismos servicios que proveían en EGR al HOSPITAL a través de la entidad DULCES SUEÑOS, LLC (DULCES SUEÑOS).[4] Por ello, se incluyó en el pleito a DULCES SUEÑOS y al DR. LUIS BARRANCO (DOCTOR BARRANCO), su presidente.

En consecuencia, el 4 de junio de 2019, el HOSPITAL presentó una *Urgente Solicitud de Intervención* en la cual imploró la intervención en los procedimientos ante las alegaciones de EGR.[5] Al poco tiempo, el 6 de junio de 2019, se decretó *Orden* autorizando la intervención del HOSPITAL.[6]

Posteriormente, el 17 de junio de 2019, el HOSPITAL presentó una *Solicitud de Sentencia Sumaria*.[7] En resumen, arguyó que el 1 de mayo de 2015, EGR otorgó un contrato de servicios profesionales para proveerles los servicios de anestesiología. En dicho contrato, se convino que, a la terminación o vencimiento, el HOSPITAL y/o un nuevo contratista podría

---

[3] Apéndice de la *Apelación*, págs. 40- 48.
[4] *Íd.*, págs. 49- 66.
[5] *Íd.*, págs. 67- 72.
[6] Entrada Núm. 11 en el expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC).
[7] Apéndice de la *Apelación*, págs. 73- 120.

contratar directamente a cualquiera o todos los anestesiólogos y/o anestesistas subcontratados por **EGR**. Argumentó que la cláusula de no competencia incorporada en los contratos de **EGR** es contradictoria a lo pactado. Así, propuso once (11) hechos los cuales, a su entender, no estaban en controversia. Entre estos, la terminación del contrato efectivo al 8 de abril de 2019.

El 2 de agosto de 2019, **EGR** presentó una *Moción Sometiendo Posición sobre Solicitud de Sentencia Sumaria de[l] Hospital Dr. Pila,* en el cual, entre otras cosas, adujo el **HOSPITAL** no tenía legitimación activa para solicitar la nulidad de los contratos válidamente otorgados entre **EGR** y sus contratados.[8] Toda vez que quien podía ejercer dicha acción eran los obligados principalmente por el contrato. Añadió que debía dictarse sentencia sumaria a su favor dado que de los contratos surgía que los señores **SERRANO MERCADO**, **VARGAS PÉREZ**, **MORALES RAMOS** y **BURGOS ROBLES** renunciaron a su derecho a laborar con el **HOSPITAL** por un año luego de terminar su relación contractual y no cumplieron con ello.

El 26 de agosto de 2019, **DULCES SUEÑOS** presentó *Moción Uni[e]ndose a los Dichos de la Moción sobre Sentencia Sumaria Presentada por Hospital Dr. Pila de Ponce*.[9] Planteó que la evidencia presentada por el **HOSPITAL** no fue objetada por **EGR**; **EGR** conocía de la fecha de terminación del contrato con el **HOSPITAL**; y este último se vio obligado a contratar a **DULCES SUEÑOS**. Finalmente, solicitó la desestimación de la *Demanda*.

Enseguida, el 28 de agosto de 2019, **EGR** presentó su *Demanda Enmendada y Solicitud de Interdicto Preliminar y Permanente.*[10] El 30 de agosto de 2019, los señores **SERRANO MERCADO**, **VARGAS PÉREZ**, **MORALES**

---

[8] Apéndice de la *Apelación*, págs. 121- 138.
[9] *Íd.,* págs. 139- 148.
[10] *Íd.,* págs. 182- 191. La enmienda a la *Demanda* se realizó a los efectos de incluir al esposo de la señora **SERRANO MERCADO**, la esposa del señor **BURGOS ROBLES** y la Sociedad Legal de Gananciales de ambos.

**RAMOS** y **BURGOS ROBLES** presentaron *Moción Uniéndonos a Solicitud de Sentencia Sumaria de Hospital Dr. Pila.*[11]

Después, el 16 de septiembre de 2019, los señores **SERRANO MERCADO**, **VARGAS PÉREZ**, **MORALES RAMOS** y **BURGOS ROBLES** presentaron su *Contestación a la Demanda Enmendada,* la cual contenía sus defensas afirmativas y una *Reconvención*.[12] En la *Reconvención*, manifestaron que sufrieron daños por las acciones de **EGR** al enterarse de que habían sido cesanteados y no podían trabajar para el **HOSPITAL** o cualquier otra empresa, viéndose así obligados a estar desempleados y a enfrentar la incertidumbre de tener que buscar empleo. Por lo anterior, reclamaron $10,000.00 para cada uno en concepto de daños y $1,000.00 en honorarios de abogado.

Así las cosas, el 1 de octubre de 2019, el foro primario determinó una *Sentencia Parcial* en la cual, entre otras cosas, declaró *ha lugar* la solicitud de sentencia sumaria presentada por el **HOSPITAL** y desestimó la *Demanda* instada por **EGR** contra las partes codemandadas, exceptuando a la señora **VARGAS PÉREZ** e impuso $1,000.00 en concepto de temeridad.[13]

El 11 de octubre de 2019, los señores **SERRANO MERCADO**, **VARGAS PÉREZ**, **MORALES RAMOS** y **BURGOS ROBLES** solicitaron la anotación de rebeldía a **EGR** por no haber replicado a su *Reconvención*.[14] En breve, el 21 de octubre de 2019, la señora **VARGAS PÉREZ** presentó *Moción de Reconsideración* exponiendo que los efectos de la *Sentencia Parcial* en contra de **EGR** debían ser extendidos a ella como cuestión de derecho.[15] El 31 de octubre de 2019, mediante *Resolución* se procedió a anotarle la rebeldía a **EGR**.[16]

---

[11] Apéndice de la *Apelación*, págs. 149- 181.
[12] Apéndice de la *Apelación*, págs. 192- 201.
[13] *Íd.,* págs. 202- 232.
[14] *Íd.,* pág. 247.
[15] Entrada Núm. 100 en el expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC).
[16] Apéndice de la *Apelación,* pág. 248.

Luego de varios incidentes procesales, el 9 de diciembre de 2020, se expidió *Sentencia Parcial* declarando ha lugar el petitorio de la señora **Vargas Pérez**, y por consiguiente desestimó la demanda en su contra.[17]

El 3 de diciembre de 2021, se intimó *Sentencia Parcial* en la cual se declaró ha lugar la *Moción Desistimiento y Desestimación de Reconvención* dando por desistida la reclamación de **Dulces Sueños.**[18]

Más tarde el 23 de agosto de 2022, se celebró la audiencia en rebeldía.[19] El 2 de febrero de 2023, el tribunal apelado prescribió la *Sentencia* apelada. En dicha decisión, se formularon las siguientes determinaciones de hechos, las cuales se dieron por admitidas:

1. Los demandantes son todos anestesistas, salvo por la Demandada Elsa Vargas quien fue secretaria de la empresa EGR.

2. Los demandados han sido empleados de EGR hasta el mes de abril de 2019 cuando ante la terminación del contrato de servicios de EGR con el Hospital Dr. Pila de Ponce, fueron cesanteados.

3. EGR es por información o creencia de los demandados una empresa que se dedica a brindar servicios médicos de anestesia.

4. EGR contrató como anestesistas y empleados a Serrano, Burgos y Morales como parte de los servicios médicos que proveía al Hospital Dr. Pila en Ponce, Puerto Rico. A Vargas la contrató como secretaria.

5. EGR brindaba sus servicios al Hospital Dr. Pila de Ponce, Puerto Rico[,] dentro del marco de un contrato de servicios de fecha 1 de mayo de 2015 con el Hospital Dr. Pila.

6. Mientras los demandados eran empleados de EGR, y Edwin García Rivera era el presidente de la corporación, el contrato de servicios profesionales con el Hospital Dr. Pila de Ponce era para brindarle a dicho hospital los servicios de anestesia a los pacientes del hospital las 24 horas del día y los 365 días del año.

7. A la fecha de los hechos relevantes de esta demanda el Dr. García Rivera era presidente de la corporación EGR.

8. Los servicios que EGR ha provisto al Hospital Dr. Pila en Ponce han sido servicios de anestesia para los pacientes que acudían al Hospital, y por información o creencia de los demandados, EGR ha provisto los servicios al amparo del referido contrato

---

[17] *Íd.*, págs. 233- 246. En el caso **KLAN202100085,** el 11 de agosto de 2021, este Tribunal de Apelaciones emitió *Sentencia* en la cual confirmó la *Sentencia Parcial* (9 de diciembre de 2020) en la cual se desestimó la *Demanda* entablada por **EGR** contra la señora **Vargas Pérez.**

[18] Apéndice de la *Apelación*, pág. 282.

[19] Entrada Núm. 226 en el expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC).

entre EGR y el Hospital Dr. Pila, contrato que venció pero que se mantuvo vigente de mes a mes hasta el mes de mayo de 2019.

9. En el referido contrato, EGR acordó con el Hospital Dr. Pila lo siguiente:

"El término del contrato será de un (1) año. El Contratista le notificará por escrito al Hospital sobre la proximidad de la fecha de terminación del contrato con noventa días antes de la fecha de terminación del mismo. Si [una] vez notificado por el Contratista, a los 30 días de antelación a la fecha de terminación del contrato el Hospital no ha notificado su intención de no renovar el mismo o si las partes no hubiesen pactado y convenido un contrato de servicio por un nuevo término; el presente contrato se tendrá prorrogado mes a mes."

10. El Contrato de Servicios Profesionales entre EGR y el Hospital además dispone expresamente que:

"Una vez vencido el término de este contrato o cancelado el mismo, el Contratista reconoce y acepta que el Hospital y/o un nuevo contratista de este último podrán contratar directamente a cualquiera o a todos los anestesiólogos y/o anestesistas que habían sido subcontratados por el Contratista para rendir los servicios contemplados en este contrato.

"Las obligaciones de este Contrato permanecerán vigentes aún después del término del mismo. La omisión (parcial o total) o tardanza de las Partes de ejercitar cualquier derecho, obligación o privilegio bajo este Contrato no será considerada una renuncia de las Partes a su derecho de requerir el cumplimiento de las disposiciones de este Contrato."

11. A los demandados EGR les requería periódicamente y usualmente por periodos de un año suscribir unos contratos de empleo.

12. Como parte de los contratos que se les requería firmar, también se les requería aceptar y firmar unos acuerdos de no competencia por 12 meses después de la terminación del empleo a cambio de un pago de mil dólares ($1,000.00). Dichos acuerdos de no competencia que EGR requería que se firmaran periódicamente, requerían a los demandados la aceptación y cobro de un cheque de mil dólares so pena de ser despedidos. En el caso de Elsa Vargas el pago era por $500.00.

13. Otra cláusula de los contratos impuesta sobre los demandados corresponde a una que dispone y citamos:

"El anestesista entiende y acepta que bajo ninguna circunstancia una vez terminada la relación contractual del presente contrato contratará con otra entidad, corporación, organización cuyo fin o propósito sea ofrecer servicios de ANESTESIA y/o

similares a los servicios que se obliga a prestar mediante el presente contrato, por un año a partir del momento en que se dé por terminado el presente contrato, en el área geográfica limitada a los municipios de Ponce, en específico [al] Hospital Metropolitano Dr. Pila. Esta prohibición se aplica única y exclusivamente a las funciones y responsabilidades del presente contrato. EL ANESTESISTA acepta el cheque número _____ emitido el día ____ de _____ de 20____ de Mil dólares ($1,000.00) en contra-prestación de esta cláusula de competencia".

14. Otra cláusula provista por el contrato de los anestesistas, específicamente la cláusula [decimosexta] disponía lo siguiente y citamos:

"El anestesista entiende y acepta que bajo ningún concepto realizará cubierta de guardia ni de per diem en institución hospitalaria y/o servicio de la salud alguna con el cual LA CORPORACIÓN [refiriéndose a la Demandante] no posea contrato de servicios a ofrecer".

15. El contrato de servicios entre el Hospital Dr. Pila y EGR prohibía que EGR impusiera sobre su personal médico el acuerdo de no competencia referido en la Demanda Enmendada, personal que incluía a los anestesistas demandados.

16. Sabiendo que la empresa EGR no podía imponer en los referidos contratos un acuerdo de no competencia a los demandados, año tras año EGR a través del Dr. García obligaba a los demandados a someterse al mismo so pena de despedirlos.

17. Al así hacerlo y al amenazarlos con el despido si no lo firmaban, EGR hacía sentir a los demandados temor por su empleo.

18. La imposición del acuerdo de no competencia sobre los demandados por parte de EGR fue llevada a cabo haciendo además a ellos creer que mientras fueran fieles al contrato de empleo con EGR, y mientras cumplieran el mismo incluyendo el acuerdo de no competencia, que continuarían contando con seguridad de empleo en EGR.

19. No obstante[,] haber representado y hecho ver a los demandados que habrían de contar con la referida seguridad de empleo, en el mes de marzo de 2019, mientras EGR contaba con un contrato de servicios con el Hospital Dr. Pila de mes a mes, hecho que desconocían los demandados, el Hospital Dr. Pila notificó a EGR que no habría de extender ni renovar el contrato de servicios de EGR, notificando la terminación de la relación contractual al 5 de mayo de 2019.

20. No obstante[,] la notificación de la vigencia del contrato hasta el 5 de mayo de 2019 EGR decidió poner fin a la relación contractual con el Hospital Dr. Pila el 8 de abril de 2019 y así lo notificó a los demandados informándoles que sus empleos cesarían al final del mes de abril de 2019.

21. No obstante[,] la cesantía ante la terminación del contrato con el Hospital Dr. Pila, y considerando el hecho de que EGR no tenía otros contratos con otros hospitales para permitir a los demandados continuar trabajando con EGR, EGR procedió durante el mes de abril de 2019 a recordarle a los demandados que habían firmado el acuerdo de no competencia, que lo tenían que cumplir, y que de no cumplir con el mismo los demandaría.

22. No obstante[,] los hechos expuestos en la Reconvención, EGR procedió a dar curso a la presentación de esta Demanda Enmendada contra los demandados para hacer valer los alegados derechos bajo el acuerdo de no competencia.

Conforme las anteriores determinaciones de hechos, precisó que, al imponer la cláusula de *no competencia* en el contrato, **EGR** obró de mala fe, violentando los términos de su relación contractual con los señores **SERRANO MERCADO**, **VARGAS PÉREZ**, **MORALES RAMOS** y **BURGOS ROBLES**. A tales efectos, condenó a **EGR** al pago de las siguientes partidas: (1) señora **SERRANO MERCADO** - $12,000.00; (2) señor **BURGOS ROBLES** - $12,000.00; (3) señora **VARGAS PÉREZ** - $10,000.00; (4) señor **MORALES RAMOS** - $10,000.00; además de $11,000.00 en concepto de honorarios de abogados.

Inconforme con el susodicho fallo, el 6 de marzo de 2023, **EGR** y el señor **GARCÍA RIVERA** acudieron ante este foro revisor mediante *Apelación Civil* señalando el(los) siguiente(s) error(es):

Erró el Tribunal al determinar que el establecer una Cláusula de no competencia en un contrato, la cual cumplía con todos los criterios para su licitud, se pagó la correspondiente compensación y la que los contratados no tuvieron que cumplir por quedar relevados de la misma, al contradecir otra cláusula en el Contrato con el Hospital, constituye un Acto Culposo y Negligente.

Erró el Tribunal al aplicar la teoría del abuso del derecho la cual no aplica, ya que el estado de derecho vigente es que un patrono tiene la facultad de establecer las normas de su empresa, bajo la libertad de contratación.

Erró el Tribunal al cometer abuso de discreción e incurrir en perjuicio, parcialidad o error manifiesto en la apreciación de la prueba, al conceder daños que no encuentran apoyo en la prueba desfilada en la celebración de la vista rebeldía, con la cual se establece que los reconvinientes no sufrieron daño alguno.

Erró el Tribunal al imponer honorarios de abogado bajo la Ley 402 del 12 de mayo de 1958 (32 LPRA § 3114 y s.s.), cuando esto no es ninguna reclamación laboral de un empleado contra el patrono al amparo de la legislación laboral local o federal, esto es una controversia contractual, además ya en el mismo caso el Tribunal había impuesto honorarios de abogado por temeridad.

Junto a su escrito, presentaron una *Moción en Solicitud de Transcripción de la Prueba Oral de la Vista en Rebeldía*. El 8 de marzo de 2023, pronunciamos *Resolución* concediendo, entre otras cosas, término de treinta (30) días a los señores SERRANO MERCADO, VARGAS PÉREZ, MORALES RAMOS y BURGOS ROBLES para presentar su alegato en oposición, así como un término de treinta (30) días a EGR y el señor GARCÍA RIVERA para presentar la transcripción estipulada.

El 5 de mayo de 2023, EGR y el señor GARCÍA RIVERA presentó *Moción Sometiendo la Transcripción de la Prueba Oral*. El 16 de mayo de 2023, emitimos *Resolución* concediendo un plazo perentorio de quince (15) días a los señores SERRANO MERCADO, VARGAS PÉREZ, MORALES RAMOS y BURGOS ROBLES para examinar el proyecto de transcripción de prueba oral y exponer si estipulaban, tenían alguna enmienda u objetaban la misma.

Concedidas varias prórrogas, el 2 de octubre de 2023, los señores SERRANO MERCADO, VARGAS PÉREZ, MORALES RAMOS y BURGOS ROBLES presentaron su *Oposición a Apelación*. A continuación, el 27 de octubre de 2023, el licenciado Roberto Maldonado Nieves, representación legal de los señores SERRANO MERCADO, VARGAS PÉREZ, MORALES RAMOS y BURGOS ROBLES, presentó *Moción en Torno a Representación Legal* en la cual notificó que el 4 de octubre de 2023, advino en conocimiento de su suspensión de la profesión legal, por lo que, en cumplimiento de su obligación rogó que se le confiriera a sus representados el periodo de veinte (20) días para gestionar una nueva representación legal. [20] Conforme a ello, el 2 de noviembre de 2023,

---

[20] Véase *In re: Maldonado Nieves*, 213 DPR 119 (2023). El 22 de mayo de 2023, los señores SERRANO MERCADO, VARGAS PÉREZ, MORALES RAMOS y BURGOS ROBLES, por conducto de su representación legal, el licenciado Maldonado Nieves, presentaron *Moción en Torno a Términos Provistos* comunicando que requería de una intervención quirúrgica (desprendimiento de retina) y necesitaban un plazo de quince (15) días para coordinar todos los detalles en relación a su condición y tratamiento. Consecuentemente, el 8 de junio de 2023, se emitió *Resolución* declarando ha lugar la prórroga solicitada y concedimos un término de siete (7) días para que informara la fecha de la intervención quirúrgica; el tiempo de recuperación; así como examinar el proyecto de la transcripción de prueba oral (TPO). A continuación, el 1 de agosto de 2023, presentaron *Moción en Cumplimiento de Orden* informando que estuvo hospitalizado por varios días, sufrió efectos secundarios causados por un medicamento y solicitando un término adicional. Por consiguiente, el 9 de agosto de 2023, se les concedió hasta en o antes de 31 de agosto de 2023, para que examinar la TPO. Aun así, el 12 de septiembre de 2023 se presentó *Solicitud de Prórroga Adicional* solicitando

dispusimos *Resolución* relevando al licenciado Maldonado Nieves de la representación legal de los señores **SERRANO MERCADO**, **VARGAS PÉREZ**, **MORALES RAMOS** y **BURGOS ROBLES** y les concedimos un plazo perentorio de veinte (20) días para anunciar su nueva representación legal.

En estas condiciones, el 27 de diciembre de 2023, los señores **SERRANO MERCADO**, **VARGAS PÉREZ**, **MORALES RAMOS** y **BURGOS ROBLES** presentaron, mediante su nueva representación legal, licenciado Edwin López Pérez, *Moción en Cumplimiento de Orden Asumiendo la Representación Legal*. El 17 de enero de 2024, este foro intermedio dictaminó *Resolución* aceptando a la nueva representación legal.

Evaluado concienzudamente el expediente del caso, habiendo dado la debida consideración a la transcripción de la prueba oral (TPO) y contando con el beneficio de la comparecencia de ambas partes, nos encontramos en posición de adjudicar. Puntualizamos las normas de derecho pertinentes a las (s) controversia(s) planteada(s).

## - II -

### - A – *Apreciación de la Prueba*

En nuestro ordenamiento jurídico, es un principio firmemente instituido que, en ausencia de error, prejuicio o parcialidad, los tribunales apelativos no intervendremos con las determinaciones de hechos, con la apreciación de la prueba, ni con la adjudicación de credibilidad efectuadas por el foro de instancia.[21] Tal deferencia descansa en que el juez ante quien declaran los testigos es quien tiene la oportunidad de verlos y observar su manera de declarar, apreciar sus gestos, titubeos, contradicciones y la

---

un aplazamiento adicional. Además, el licenciado Maldonado Nieves informó que su suegro de edad avanzada fue hospitalizado, y su permanencia se extendió por un (1) mes, hasta el 8 de septiembre de 2023. El 1 de octubre de 2023, una vez más mediante *Solicitud de Excusas Por [Filia]ción en Presentación de Oposi[ción] a Apela[ción]* expuso que, como efecto de la operación de sus ojos a la que se había sometido el 13 de junio de 2023, su tratamiento se extendió hasta el mes de diciembre de 2023, por lo que, no tenía buena visibilidad ocular, dificultándosele así el progreso del caso. Junto a su solicitud, presentó la *Oposición a Recurso de Apelación*. El 12 de octubre de 2023, emitimos *Resolución* aduciendo que, habiendo transcurrido el plazo concedido, se acogió la transcripción de prueba oral (TPO.
[21] *González Hernández v. González Hernández*, 181 DPR 746, 777 (2011); *Ramírez Ferrer v. Conagra Foods PR*, 175 DPR 799, 811 (2009).

totalidad de su comportamiento mientras declaran. Los mencionados factores son los que van formando gradualmente la convicción del juzgador sobre la verdad de lo declarado.[22]

Por su parte, la Regla 42.2 de las de Procedimiento Civil de 2009, resume los principios jurisprudenciales antes expuestos e instaura el alcance de la revisión judicial de la apreciación de la prueba desfilada ante el foro apelado. En lo pertinente, dispone que:

> [...]
> Las determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de las personas testigos.[23]
> [...]

No obstante, esta regla se contrapone a la también reconocida norma de que el arbitrio del juzgador de hechos, aunque respetable, no es absoluto. Por lo cual, una apreciación errónea de la prueba desfilada en primera instancia no tiene credenciales de inmunidad frente a la función revisora de los tribunales.[24] Así pues, los foros apelativos podemos intervenir con la apreciación de la prueba testifical que haga el juzgador de los hechos cuando este actúe con pasión, prejuicio o parcialidad, o incurra en un error manifiesto al aquilatarla.[25]

Finalmente, ante la prueba pericial y documental, es axioma judicial que el foro intermedio nos encontramos en igual posición que el foro recurrido y, por tanto, está facultado para apreciar la prueba apoyándose en su propio criterio.[26] Por ello, los foros apelativos no estamos obligados a seguir necesariamente la opinión de un perito, aunque sea técnicamente correcta.[27]

---

[22] *Suárez Cáceres v. Com. Estatal Elecciones*, 176 DPR 31, 67-68 (2009).
[23] 32 LPRA. Ap. V, R. 42.2.
[24] *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194 (2021); *Ramos Acosta v. Caparra Dairy Inc.*, 113 DPR 357, 365 (1982); *Vda. de Morales v. De Jesús Toro*, 107 DPR 826, 829 (1978).
[25] *Dávila Nieves v. Meléndez Marín*, 187 DPR 750 (2013).
[26] *Dye–Tex P.R., Inc. v. Royal Ins. Co., P.R.*, 150 DPR 658 (2000).
[27] *Díaz v. Pneumatics & Hydraulics*, 169 DPR 273 (2006).

## - B - *Libertad de Contratación*

En Puerto Rico, rige el principio de la *libertad de contratación*. Mediante esta máxima del derecho, las partes contratantes se obligan a todos los extremos de lo pactado, las cláusulas y las condiciones que tengan por conveniente, siempre y cuando sean conformes a la ley, a la moral y al orden público.[28] Por otro lado, los *contratos* son negocios jurídicos y fuente de obligación.[29] Por esta razón, un *contrato* existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio.[30]

Conforme a ello, se ha reconocido la validez de los acuerdos de *no competencia*, según los términos de la razonabilidad.[31] Para ser razonable, un acuerdo de *no competir* debe cumplir con los siguientes elementos: (1) el acuerdo debe ser necesario para proteger un interés legítimo del patrono o contratante; (2) no debe imponer al empleado o contratista una carga demasiado onerosa; y (3) no debe afectar demasiado al público.[32] Es relevante destacar, que existe otro factor a considerar y es lo relativo al área en que se le prohíbe competir al empleado o contratista, la duración de dicha restricción, el tipo de clientes que le está vedado atender, así como el tipo de servicios que se le prohíbe rendir.[33]

Acerca del interés legítimo del patrono o contratante en el acuerdo, lo fundamental es determinar si al este no recibir la protección de una cláusula de *no competencia*, su negocio se vería sustancialmente afectado. Según la doctrina, dicho interés se medirá a la luz de la posición del empleado o contratista dentro de la empresa, por ejemplo, si debido a la posición que

---

[28] Hacemos referencia al Código Civil 1930, toda vez que es el aplicable al presente recurso. Art. 1207 del Código Civil de Puerto Rico de 1930, 31 LPRA § 3372. *Feliciano v. Luxury Hotels Int'l.*, 210 DPR 712 (2022); *Demeter Int´l v. Srio. Hacienda*, 199 DPR 706 (2018).
[29] *Amador v. Conc. Igl. Univ. de Jesucristo*, 150 DPR 571, 581 (2000).
[30] Art. 1206 del Código Civil de 1930, 31 LPRA § 3371.
[31] *Martin's BBQ v. García De Gracia*, 178 DPR 978, 990 (2010).
[32] *Arthur Young & Co. v. Vega III*, 136 DPR 157, 167 (1994).
[33] *Íd.*

asume en la empresa, está facultado para competir de forma efectiva con su patrono o contratante en un futuro.[34]

Asimismo, las cláusulas de *no competencia* pueden conllevar límites geográficos, limitándose al área estrictamente necesaria para evitar la competencia real entre el patrono o contratante y el empleado o contratista.[35] También, puede hacer referencia a los clientes, sin embargo, este solo puede referirse a aquellos que el empleado o contratista atendió personalmente durante un período razonable de tiempo antes de renunciar o cesar funciones, o en un período inmediatamente anterior a la renuncia, todavía eran clientes del patrono o contratante.[36]

En cuanto al tiempo que dichas cláusulas pueden tener vigencia, nuestra jurisprudencia ha establecido que la misma no debe exceder de doce (12) meses, entendiéndose que cualquier tiempo adicional es excesivo e innecesario para proteger adecuadamente al patrono o contratante.[37] Estos elementos descritos se evaluarán teniendo en mente la naturaleza de la industria involucrada y el posible interés público relacionado.

En cambio, ante la firma de este tipo de contrato el alto foro ha determinado que el patrono o contratante debe ofrecer una contraprestación a cambio de la firma del acuerdo de *no competir* por parte del empleado o contratista. Dicha contraprestación puede consistir, por ejemplo, en la obtención de un ascenso, de beneficios adicionales en el trabajo o incluso la obtención del empleo.[38]

El Alto Foro ha afirmado sin rodeos, que los contratos que no se ajusten a los elementos antes discutidos se considerarán, **además de contrarios a la buena fe contractual, violadores del orden público por restringir de forma excesiva e injustificada la libertad de trabajo del**

---

[34] *Íd.*, pág. 175.
[35] *Íd.*, pág. 176.
[36] *Arthur Young & Co. v. Vega III, supra.*
[37] *Íd.*
[38] *Íd.*

**empleado y la libertad de selección del público en general**.[39] Por consiguiente, no se podrá modificar la voluntad de las partes para ajustarla a normas razonables, y se declarará nulo todo pacto de *no competir* que no cumpla con las anteriores condiciones.[40]

Igualmente, la interpretación de los contratos, en primer lugar, se enfoca en hallar la verdadera voluntad de los contratantes. Así, la voluntad real es, ante todo, la voluntad que presidió la formación del contrato.[41] Por ende, la interpretación debe dirigirse a que el contrato o cláusula discutida sea eficaz.[42] En consecuencia, al interpretar una cláusula de *no competencia* no tan solo se deben evaluar los criterios que rodean el acuerdo entre las partes, sino su verdadera voluntad.

### - C – *Estimación de Daños*

La estimación de daños es una difícil tarea que descansa en la sana discreción del juzgador que ha recibido prueba detallada sobre los menoscabos alegados, guiado por su sentido de justicia, ante todo, porque son ellos quienes tienen un vínculo más cercano con la prueba testifical y todos los componentes que lo rodean.[43] Así pues, se trata de una labor compleja porque no existe un mecanismo matemático que permita, de forma certera y uniforme valorar los daños exactos que recibe una persona.[44] Por tanto, la valoración de los daños siempre estará sujeta a cierto grado de especulación.[45]

Nuestro Máximo Foro ha advertido recientemente que en el proceso de valorización de daños, los tribunales no solo deben examinar la prueba desfilada ante ellos, sino que también deben evaluar las indemnizaciones concedidas en casos anteriores, puesto que estas constituyen "un punto de

---

[39] *Íd.*, pág. 177. (énfasis nuestro). Véase, además: *PACIV v. Pérez,* 159 DPR 523 (2003).
[40] *Íd.*
[41] L. Díez-Picazo, *Fundamentos Del Derecho Civil Patrimonial I; Introducción Teoría del Contrato,* 6ta edición, Civitas (2007), pág. 498.
[42] *Íd.*, pág. 499.
[43] *Cruz Flores et al. v. Hosp. Ryder et al.,* 210 DPR 465, 483 (2022).
[44] *Rodríguez Cancel v. AEE,* 116 DPR 443, 451 (1985).
[45] *Sagardía de Jesús v. Hosp. Aux. Mutuo,* 177 DPR 484, 509, (2009).

partida y referencia útil para pasar juicio sobre las concesiones otorgadas por el foro primario."[46] Por consiguiente, es norma reiterada que los tribunales apelativos guardarán deferencia a las valorizaciones de daños que hagan los foros de primera instancia, porque son éstos los que tienen contacto directo con la prueba testifical y quedan en mejor posición para emitir un juicio.[47]

### - E - *Honorarios de Abogados*

La Ley Núm. 402 de 12 de mayo de 1950, según enmendada, conocida como la *Ley que Regula la Concesión de Honorarios de Abogado en los Casos de Reclamaciones de Trabajadores o Empleados contra sus Patronos* fue creada a los fines de prohibir la contratación de honorarios profesionales con trabajadores o empleados concerniente a las reclamaciones laborales.[48] Posteriormente, la referida Ley fue enmendada por la Ley Núm. 90 de 3 de junio de 1980, en la cual el Legislador consignó en su Exposición de Motivos que:

> [S]e promulga la presente ley a los fines de dejar claramente establecido que lo dispuesto en la referida Ley Núm. 402 es aplicable a cualquier tipo de reclamación que tuviere un trabajador o empleado contra su patrono al amparo de la legislación laboral local o federal, o bajo un convenio de trabajo de naturaleza individual o colectivo.[49]

Particularmente, el Artículo 1 de la Ley Núm. 402– 1950, implanta la política pública que promueve la legislación. A esos efectos, previene:

> Por la presente la Asamblea Legislativa de Puerto Rico declara que permitir el cobro de honorarios de abogado a los trabajadores o empleados que se ven en la necesidad de reclamar contra sus patronos, al amparo de la legislación laboral federal o local o convenio de trabajo de naturaleza individual o colectivo, equivale a permitir que se reduzca el valor de su trabajo en la cantidad que paguen a sus abogados. [. . . ]. Se declara, por lo tanto, que la política del Gobierno de Puerto Rico es proteger a los trabajadores y empleados contra tales reducciones en el valor de su trabajo y proteger al interés público contra dichos contratos a base de porcentaje, ya que los mismos redundan en detrimento de la paz industrial.[50]

---

[46] *Sucn. Mena Pamias et. al. v. Meléndez et. al*, 212 DPR 758 (2023), citando a *Santiago Montañez v. Fresenius Medical*, 195 DPR 476, 491 (2016).

[47] *Rodríguez, et als. v. Hosp., et als.*, 186 DPR 889 (2012).

[48] 32 LPRA § 3114-3117. Véase, además *Berkan et al. v. Mead Johnson Nutrition*, 204 DPR 183, 211-212 (2020).; In re: *Otero, Pacheco*, 200 DPR 561, 570 (2018).

[49] *Exposición de Motivos*, Ley Núm. 90 de 3 de junio de 1980.

[50] 32 LPRA § 3114.

Precisamente, la Ley Núm. 402– 1950, prohíbe cualquier contrato o acuerdo en que un empleado se obligue directa o indirectamente a pagar honorarios en casos de reclamaciones laborales judiciales o extrajudiciales en contra de su patrono.[51] El Artículo 2 de la aludida Ley provee un remedio en los casos de una reclamación extrajudicial, cuando las partes no puedan acordar los honorarios que debe pagar el patrono a la representación legal o abogado del trabajador o empleado.[52] Específicamente, preceptúa lo siguiente:

En todo caso radicado ante los tribunales de Puerto Rico por un trabajador o empleado en que se reclame cualquier derecho o suma de dinero contra su patrono, al amparo de la legislación **laboral federal o local o convenio de trabajo de naturaleza individual o colectivo** y en que se conceda la reclamación en todo o en parte, se condenará al patrono al pago de honorarios de abogado, si éste no fuere uno de los abogados del Departamento del Trabajo y Recursos Humanos. Cuando se dicte sentencia a favor del patrono querellado no se condenará al trabajador o empleado querellante al pago de honorarios de abogado; Disponiéndose, que para los efectos de las secs. 3114 a 3117 de este título la palabra 'patrono' incluirá a las autoridades y corporaciones públicas del Gobierno Estadual y/o sus representantes. En los casos en que la reclamación sea satisfecha extrajudicialmente, las partes, además de cumplir con las disposiciones de ley sobre transacciones, deberán, si no se pusieren de acuerdo sobre los honorarios a ser pagados por el patrono querellado al abogado del trabajador o empleado querellante, someter su determinación al tribunal que hubiera tenido jurisdicción sobre el caso. Las costas de estos procedimientos serán de oficio.[53]

En la misma línea, se ha esbozado que, para proceder con la imposición de honorarios de abogado, según la referida disposición, tiene que concurrir cuatro (4) condiciones; a saber, que: (1) un empleado haga una reclamación a su empleador; (2) la reclamación surja al amparo de la legislación laboral; (3) el empleador sea un "patrono" bajo la ley; y (4) se conceda la reclamación.[54]

Por otra parte, en virtud de la Regla 44.1 (d) de las de Procedimiento Civil de 2009 se faculta a los tribunales a imponer el pago de una cuantía por

---

[51] 32 LPRA § 3116.
[52] 32 LPRA § 3115.; Véase, además, *Berkan et al. v. Mead Johnson Nutrition, supra*.
[53] 32 LPRA § 3115.
[54] *Íd.*; Véase, además: *Ortiz y otros v. Mun. de Lajas*, 153 DPR 744, 751 (2001).

concepto de honorarios de abogado, en casos donde cualquiera de las partes o sus abogados hayan procedido con temeridad o frivolidad.[55]

Es decir, la aludida Regla **requiere el elemento de "temeridad"**, que nuestro Tribunal Supremo ha definido como una actitud que se proyecta sobre el procedimiento y afecta el buen funcionamiento y la administración de la justicia.[56] Por ello, su propósito es penalizar al que con su conducta ha obligado a la parte adversa en un litigio a incurrir en gastos.[57] Además, la imposición de honorarios por temeridad descansa en la sana discreción de los tribunales.[58]

### - III -

Como primer señalamiento, **EGR** punteó que el foro apelado erró al determinar que la cláusula de *no competencia* en su contrato por servicios profesionales constituía un acto culposo y negligente. En pocas palabras, sustento que un patrono debe tener un interés legítimo en los acuerdos que otorga, y para ello, puede establecer una protección como lo es una disposición de *no competencia*. Además, que el alcance de la prohibición de la cláusula de *no competencia* no era excesivo, pues se limitaba a los mismos servicios para los cuales los contratistas fueron contratados por el término de un (1) año y esta se circunscribía a la prohibición de prestar dichos servicios.

En desacuerdo, los señores Serrano Mercado, Vargas Pérez, Morales Ramos y Burgos Robles argumentaron que el tribunal no incidió al formular sus determinaciones de hechos. Señalaron que no debíamos intervenir con las determinaciones de hechos, ni con la adjudicación de credibilidad que haya efectuado el juzgador de los hechos. En esa misma dirección, expresaron que los foros revisores no deben intervenir con las determinaciones de hechos que realicen los jueces de instancia, salvo que medie error manifiesto, pasión, perjuicio o parcialidad.

---

[55] 32 LPRA Ap. V, R. 44.1(d).
[56] *Jarra Corp. v. Axis Corp.*, 155 DPR 764, 779 (2001). (énfasis nuestro).
[57] *S.L.G. Flores-Jiménez v. Colberg*, 173 DPR 843, 866 (2008).
[58] *Torres Montalvo v. Gobernador ELA*, 194 DPR 760, 790 (2016).

En su segundo señalamiento, **EGR** planteó que se equivocó el foro *a quo* al aplicar una teoría del derecho de abuso de derecho, la cual, según su exposición, no es aplicable a la presente controversia. Razonó su posición en que el estado de derecho vigente apareja que un patrono o contratante tiene la facultad al amparo de la libre contratación para fijar cuáles serán las condiciones de empleo de la empresa. Afirmó que, el establecer cláusulas de *no competencia* era una acción válida, pues su finalidad es proteger la empresa y, por consiguiente, los puestos de sus empleados o contratistas. En ese sentido, amplió que ante tal propósito no puede entenderse como abuso del derecho.

Por su parte, los señores **SERRANO MERCADO**, **VARGAS PÉREZ**, **MORALES RAMOS** y **BURGOS ROBLES** expresaron que, si bien es cierto que existe autonomía en la libre contratación, tal principio no es ilimitado, dado que puede ser restringido al evaluarlo a la luz de la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, conocida como *Ley Sobre Despidos Injustificados*, que preceptúa, entre otras cosas, que los patronos deben adoptar reglamentos razonables, pero no abusivos o arbitrarios.

En lo concerniente al tercer planteamiento, **EGR** adujo que erró el tribunal de instancia al conceder los alegados daños ante la ausencia de prueba que demostrara que los señores **SERRANO MERCADO**, **VARGAS PÉREZ**, **MORALES RAMOS** y **BURGOS ROBLES** sufrieron agravios como consecuencia de la cláusula de *no competencia* en sus respectivos contratos. Por lo que, aseveró que el tribunal abusó de su discreción e incurrió en perjuicio, parcialidad o error manifiesto. En relación a lo anterior, los señores **SERRANO MERCADO**, **VARGAS PÉREZ**, **MORALES RAMOS** y **BURGOS ROBLES** declamaron que dicho error no fue cometido, pues los hechos considerados por el foro primario fueron admitidos por las partes.

En este caso, por estar íntimamente relacionados, discutiremos el primer, segundo y tercer error en conjunto. Veamos.

En lo concerniente al incumplimiento del contrato y a la partida de daños económicos, resulta fundamental justipreciar si la cláusula de *no competencia* incluida en un contrato por servicios profesionales es una abusiva o contraria a la ley y al orden público, o, si por el contrario es una disposición legítima que fue violentada y su incumplimiento resultó en daños económicos.

Al contemplar la integridad del historial judicial, es preciso señalar que según se desprende del expediente, el contrato por servicios profesionales entre **EGR** y los señores **SERRANO MERCADO**, **VARGAS PÉREZ**, **MORALES RAMOS** y **BURGOS ROBLES** tuvo vigencia de un (1) año. Sustancialmente, la cláusula vigésima del contrato establece:

> VIGESIMO: Las partes acuerdan que el término del presente contrato será de un (1) año a partir del lunes, 1 de abril de 2019, y se renovará automáticamente por igual términos y condiciones. Igualmente, la duración del mismo queda condicionada a los contratos entre **LA CORPORACION** y **EL HOSPITAL**.[59] (Énfasis suplido).

Al interpretar tal disposición podemos -razonablemente- establecer que, al culminar el contrato el 1 de abril de 2020 sin comunicación alguna, el contrato quedaría renovado tácitamente hasta tanto y cuanto estuviese vigente el contrato entre **EGR** y el **HOSPITAL**. Ahora bien, del apéndice del recurso se desprende que, el 5 de abril de 2019, el **HOSPITAL** por conducto del señor Rafael Alvarado, su director ejecutivo, cursó una misiva al doctor Edwin García, presidente de **EGR,** apercibiéndole que en la comunicación remitida el 1 de marzo de 2019, éste reconoció que el contrato terminaba el 30 de abril de 2019. Además, le fue notificado que el mismo culminaría el 5 de mayo de 2019 a las 11:59 de la noche.

Como consecuencia, el 8 de abril de 2019, **EGR** suscribió carta al **HOSPITAL** en la cual expresó:

> Entendemos que dicha decisión no fue basada ni en nuestra ejecutoria ni en busca de mejores servicios. Otras razones de índole caprichosa y/o personal obran en esta decisión.

---

[59] Apéndice de la *Apelación*, pág. 58.

Razón por la cual damos por terminado de manera inmediata nuestra cubierta de servicios efectiva en el día de hoy a las 4 de la tarde, luego de esta hora hasta las 7am únicamente cubriremos los casos de emergencia, en donde la vida o la muerte del paciente este en riesgo.[60]

De esa manera, **EGR** aceptó la conclusión del contrato por servicios profesionales con el **HOSPITAL**. Los señores **SERRANO MERCADO**, **VARGAS PÉREZ**, **MORALES RAMOS** y **BURGOS ROBLES**, al haber sido parte del acuerdo contractual por estar bajo contrato con **EGR**, culminaron sus servicios al recibir ese mandato por parte de **EGR**.

Específicamente, cuando evaluamos el contrato de servicios profesionales entre **EGP** y los señores **SERRANO MERCADO**, **VARGAS PÉREZ**, **MORALES RAMOS** y **BURGOS ROBLES** es preciso analizar e interpretar la cláusula de *no competencia* y las subsiguientes disposiciones. La cláusula decimoquinta lee de la siguiente manera:[61]

> DECIMO–QUINTO: **LA ANESTESISTA** entiende y acepta que bajo ninguna circunstancia una vez terminada la relación contractual del presente contrato contratará con entidad, corporación, organización cuyo fin o propósito sea ofrecer servicios de ANESTESIA y/o similares a los servicios que se obliga a prestar mediante el presente contrato, por un (1) año a partir del momento en que se dé por terminado el presente contrato, en el área geográfica limitada a los Municipios de Ponce, **en específico a EL HOSPITAL**–**Metropolitano Dr. Pila**. Esta prohibición se aplica única y exclusivamente a las funciones y responsabilidades del presente contrato. **EL ANESTESISTA** acepta el cheque responsabilidades del presente contrato. **EL ANESTESISTA** acepta el cheque número ___ emitido el día ___ de _____ del 20__ por la cantidad de Mil Dólares ($1,000.00) en contraprestación de esta cláusula de competencia. (Énfasis suplido).

Asimismo, la cláusula decimoséptima expresa lo siguiente:[62]

> DECIMO–SEPTIMO: **LA ANESTESISTA** entiende y acepta que bajo ningún concepto realizará cubierta de guardia ni per diem en institución de hospitalaria y/o de salud alguno con el cual **LA CORPORACIÓN** no mantenga contrato de servicios. (Énfasis suplido).

Al interpretar conjuntamente ambas disposiciones contractuales, concebimos que: (1) los señores **SERRANO MERCADO**, **VARGAS PÉREZ**, **MORALES**

---

[60] *Íd.*, pág. 107.
[61] Apéndice de la *Apelación*, pág. 57.
[62] *Íd.*

**RAMOS** y **BURGOS ROBLES** al cesar sus funciones con **EGR,** estaban impedidos de firmar por un (1) año un acuerdo contractual con cualquier entidad cuyas funciones fuesen compatibles con servicios de anestesia o similares; y (2) dicha condición – *de exclusividad* – estaba condicionada a una contraprestación de mil dólares ($1,000.00). A pesar de, al leer la disposición decimoséptima, notamos que ésta especifica que la prohibición se limitaba a las instituciones de servicios médicos y/o hospitalarios con los cuales **EGR** no mantuviese contratos de servicios.

Ciertamente, los señores **SERRANO MERCADO**, **VARGAS PÉREZ**, **MORALES RAMOS** y **BURGOS ROBLES** tenían un acuerdo contractual con **EGR** para la exclusividad de sus servicios médicos – hospitalarios. La relación contractual entre los señores **SERRANO MERCADO**, **VARGAS PÉREZ**, **MORALES RAMOS** y **BURGOS ROBLES** y **EGR** culminó el 8 de abril de 2019, cuando el propio director ejecutivo de **EGR** aceptó la decisión del **HOSPITAL**. Por lo que, desde ese día y hasta el 8 de abril de 2020, era de aplicación la cláusula de *no competencia* contenida en el *Contrato Servicios Profesionales Anestesistas en* entre **EGR** y los señores **SERRANO MERCADO**, **VARGAS PÉREZ**, **MORALES RAMOS** y **BURGOS ROBLES**. Entendemos que la cláusula de *no competencia* es legítima, pues persigue el proteger un interés legítimo del patrono o contratante **EGR**. Los señores **SERRANO MERCADO**, **VARGAS PÉREZ**, **MORALES RAMOS** y **BURGOS ROBLES** aceptaron la cláusula de *no competir* a cambio de beneficios adicionales como parte de su contrato que consistió en la aceptación de un cheque por la cuantía de $1,000.00.

Al evaluar concienzudamente la *Transcripción de la Prueba Oral* surge de los testimonios de los señores **SERRANO MERCADO**, **VARGAS PÉREZ**, **MORALES RAMOS** y **BURGOS ROBLES** que, a pesar de que el contrato por servicios profesionales culminó el 8 de abril de 2019, lo cierto es que sus salarios fueron cubiertos por **EGR** hasta la quincena del 30 de abril de 2019.[63]

---

[63] Véase TPO, pág. 50, líneas 8-9; pág. 78, líneas 12-25; pág. 79, líneas 1-13; pág. 108, líneas 12-25; pág. 109, líneas 1-2; pág. 110, líneas 12-19; pág. 194, líneas 9-11.

Es decir, se pagó el sueldo completo correspondiente al mes de abril de 2019. Además, el propio señor **BURGOS ROBLES** en su declaración reconoció que solamente estuvo sin empleo del 8 al 15 de abril de 2019, pero recibió remuneración hasta el 30 de abril de 2019.[64] De igual manera, según el testimonio de la señora **SERRANO MERCADO**, esta comenzó a trabajar como anestesista de **DULCE SUEÑOS**, el nuevo contratista de Dr. Pila, el 8 de mayo de 2019.[65]

En este caso, el foro *a quo* tuvo la oportunidad de contrastar y distinguir hechos para establecer similitud de daños y valorizar cuantías. Condenó a **EGR** al pago de las siguientes cuantías: $12,000 para la señora **SERRANO MERCADO**; $12,000 para el señor **BURGOS ROBLES**; $10,000 para la señora **VARGAS PÉREZ**; $10,000 para el señor **MORALES RAMOS** y $11,000 en conceptos de honorarios de abogado. La sumatoria es de $55,000.00.[66] Para ello, utilizó de referencia la siguiente jurisprudencia: *Santiago v. Fresenius; Agosto v. Woolworth;* y *Rivera v. Tiendas Pitusa Inc*.[67] En los tres (3) casos, los hechos son distintivos al presente caso y las partes lograron mostrar los agravios alegados.

En nuestro caso, de la prueba testifical se desprende que **EGR** cumplió con los pagos de las quincenas correspondientes al mes de abril de 2019. Días después, los señores **SERRANO MERCADO**, **VARGAS PÉREZ**, **MORALES RAMOS** y **BURGOS ROBLES** comenzaron a trabajar para **DULCES SUEÑOS**. Por ende, no hallamos prueba en el apéndice del recurso que nos convenciera a concluir que hubo daños, angustias mentales o una pérdida económica sustancial por parte de los señores **SERRANO MERCADO**, **VARGAS PÉREZ**, **MORALES RAMOS** y **BURGOS ROBLES** como causa o motivo de la conclusión del contrato con **EGR**. Así las cosas, colegimos que las cuantías impuestas no proceden, toda vez que los señores **SERRANO MERCADO**, **VARGAS PÉREZ**, **MORALES RAMOS** y **BURGOS**

---

[64] Véase TPO, págs. 78 – 86. Específicamente, la pág. 79, líneas 20-23; pág. 80, líneas 1-22.
[65] Véase TPO, pág. 139.
[66] Apéndice de la *Apelación*, pág. 38.
[67] 195 DPR 476 (2016); 143 DPR 76 (1997); 148 DPR 695 (1999).

ROBLES no lograron probar los alegados daños y perjuicios ni la pérdida económica que alegaron en su *Reconvención*.

En su cuarto señalamiento, **EGR** señaló que el tribunal apelado desacertó al imponer honorarios de abogado al amparo de la Ley Núm. 402 del 12 de mayo de 1950, según enmendada, mejor conocida como *Ley que Regula la Concesión de Honorarios de Abogado en los Casos de Reclamaciones de Trabajadores o Empleados contra sus Patronos*. Fundamentó su posición, en que el citado estatuto cobija a todo trabajador o empleado que establezca una reclamación de índole laboral. Por su parte, los señores SERRANO MERCADO, VARGAS PÉREZ, MORALES RAMOS y BURGOS ROBLES manifestaron que, es incorrecto afirmar que la presente controversia no es de índole laboral cuando el asunto contractual gira en torno a salarios y compensaciones.

En este caso, escudriñada la *Reconvención*, no se presentó reclamación o alegación laboral alguna sino de una causa de acción por daños y perjuicios. Por ello, es necesario aclarar que el caso de marras versa sobre causas de acción por alegado incumplimiento de contrato y daños extracontractuales. En ese sentido, aunque para entender y resolver el caso es menester evaluar información que incluye asuntos de índole laboral, lo cierto es que no estamos ante una *querella* al amparo de un procedimiento sumario de una reclamación laboral o violación de alguna legislación laboral. Ello significa que no procede la imposición de honorarios de abogado a favor de los señores SERRANO MERCADO, VARGAS PÉREZ, MORALES RAMOS y BURGOS ROBLES desde una -*perspectiva laboral*-al amparo de la Ley 402- 1958. En resumidas cuentas, no podemos avalar la imposición de honorarios de abogado a **EGR** utilizando como subterfugio una -*perspectiva laboral*-. Por lo cual, discernimos que se incidió en los errores.

- IV -

Por los fundamentos antes expuestos, y en consideración a la *Sentencia* prescrita el 1 de octubre de 2019, que desestimó la *Demanda y*

*Solicitud de Interdicto Preliminar y Permanente* instada por **EGR** quedando pendiente únicamente por resolver lo concerniente a los alegados daños y perjuicios sufridos como consecuencia de la cláusula de no competencia; *revocamos* la *Sentencia* pronunciada el 2 de febrero de 2023 por el Tribunal de Primera Instancia, Sala Superior de Ponce; y ***desestimamos, con perjuicio,*** la *Reconvención* interpuesta el 16 de septiembre de 2019 por los señores **LILLIAM SERRANO MERCADO**, **ELSA H. VARGAS PÉREZ**, **JOSÉ A. MORALES RAMOS** y **JOEL BURGOS ROBLES**.

   **Notifíquese inmediatamente.**

   Lo acordó el Tribunal y lo certifica la Secretaría del Tribunal de Apelaciones.


                    Lcda. Lilia M. Oquendo Solís
                 Secretaria del Tribunal de Apelaciones